IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**JOSHUA DOSS, Individually and on**                              **PLAINTIFF**
**Behalf of All Others Similarly Situated**

**vs.**                              **No. 4:19-cv-296-KGB**

**CUSTOM AUTO SERVICE, INC.,**
**and KEVIN STRAYHORN**                              **DEFENDANTS**

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Custom Auto Service, Inc. and Kevin Strayhorn, individually (Defendants), by and through their undersigned counsel, and for their Brief in Support of Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, state:

### I.   INTRODUCTION

Plaintiff Joshua Doss ("Plaintiff") filed this lawsuit claiming unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. and the Arkansas Minimum Wage Act (AMWA), Ark. Code Ann. § 11-4-201, *et seq.*  Plaintiff specifically alleges that he was classified as a non-exempt employee paid on a piece-rate basis that failed to properly compensate him for all overtime hours worked. Plaintiff initiated this lawsuit as a collective action, which was conditionally certified (ECF No. 19), yet no members of the putative class opted into the lawsuit.  As such, Plaintiff proceeds only on his individual claims. Defendant denies that Plaintiff is entitled to overtime pay. The objective evidence available, when taken in the light most favorable to Plaintiff, shows that no genuine issue of material fact exists.  Accordingly, Defendants are entitled to summary judgment on all claims brought by Plaintiff.

For the reasons contained in Defendants' Motion for Summary Judgment, Statement of Undisputed Facts, and this Brief in Support, Plaintiff's Complaint should be dismissed in its entirety pursuant to Fed. R. Civ. P. 56.

## II.    FACTS

Custom Auto Service, Inc. (Custom Auto) is a locally-owned and operated auto body repair shop in Little Rock, Arkansas.  Declaration of Kevin Strayhorn, ¶ 3, attached as Exhibit 1 to Motion for Summary Judgment. It has operated at the same location in Little Rock, Arkansas, since 1980. *Id*. It provides various auto repair services including general auto body repair, paintless dent repair, mechanical repair, auto glass repair, refinishing, and related services. *Id*. Its operations are divided between a Body Shop and a Paint Shop. *Id*.  Custom Auto also provides convenience services to its customers, such as a free pick-up and drop-off for customers who need transportation to and from its shop and their homes or worksites while their vehicles are being serviced. *Id*.  Custom Auto does not operate any tow trucks nor does it provide any towing services. *Id*.

Custom Auto advertises services to the general public through our website available at https://customautoinc.com. Strayhorn Dec., ¶ 4. Custom Auto does not provide any goods or services for resale or wholesale. *Id*.  Rather, all of its services are provided directly to the end-user customers. *Id*.  This is common in the auto body repair shop industry for over 40 years. *Id*.

Custom Auto's revenue is derived from retail sales for auto repair services and the goods used in the repair work.  Strayhorn Dec., ¶ 5; Declaration of Monty Fulmer, ¶ 4, attached as Exhibit 5 to Motion for Summary Judgment.  All of its sales were derived from auto repair services as described above, and 100% of Custom Auto's revenues are derived from these kinds of sales. *Id*. These invoices are demonstrative of revenues received by Custom Auto for years

2017-2020 as well, and the same billing system has been used in that entire time. *Id*. Custom Auto does not provide in-house financing but does accept payment from customers' auto insurance providers.  Strayhorn Dec., ¶ 6; Fulmer Dec., ¶ 6.

Custom Auto services both individual and commercial customers such as local auto dealerships.  Strayhorn Dec., ¶ 7.  Custom Auto has no public contracts and does not provide services on behalf of any governmental agencies.  *Id*.  Repair jobs are performed on individual vehicles and billed to each customer's account for all services provided. Strayhorn Dec., ¶ 8; Fulmer Dec., ¶ 7.  Custom Auto does not engage in any manufacturing of goods.  *Id*. Custom Auto does not pay any employees by a piece-rate compensation system.  Strayhorn Dec., ¶ 9; Fulmer Dec., ¶ 8.  Some employees are salaried, others are paid commissions, and others are non-exempt and receive overtime pay for all hours worked in excess of 40 hours per workweek. *Id*.  Custom Auto bases compensation upon job duties performed by employees.  *Id*.

Job positions vary at Custom Auto.  These varying duties involve estimating auto repair work and costs, administration, painting, prepping, body repair, detailing, and more auto body repair work. Strayhorn Dec., ¶ 10. Custom Auto takes pride in the quality of its work for its customers, including top-quality auto body and paint repairs.  Painters with more experience and better skills are able to more efficiently provide these quality services to customers. *Id*.  Work demands vary entirely upon customer needs.  *Id*. In some weeks, Custom Auto has numerous repair jobs going on at the same time with others waiting to be completed, and other weeks work slows to only a few customer jobs.  *Id*.  As such, painters' and other technicians' hours fluctuate due to business needs.

Plaintiff was employed by Custom Auto as a Painter/Prepper in the Paint shop throughout his employment.  Strayhorn Dec., ¶ 10; Fulmer Dec., ¶ 10. His job duties included preparing automobiles to be painted, painting those automobiles, and finishing/detailing.  *Id*.  Plaintiff, and

others, sometimes cleaned the Paint shop and they reported those hours on their time slips and also reported them as flag hours, which were paid at a higher percentage. *Id.* There are other employees in the Paint shop at Custom Auto.  Tim Fleming was a Painter who worked with Plaintiff, among others.  *Id*.

For its billing system, *i.e.* operational revenue, Custom Auto provides its customers with estimates for hours of labor and the amount of goods it expects will be necessary to complete the auto repair work needed for the customers' vehicle, which are also referred to as "flag hours." Strayhorn Dec., ¶ 12; Fulmer Dec., ¶ 11.  Customers approve the estimate and the flag hours billed to the customers after the work is completed, whether any additional or less work is required during the repair work. *Id.*  Flag hours are pre-determined based on the estimated amount of labor needed, products used, and offer costs (e.g,. hazardous waste removal, battery and tire recycling fees, etc.) in order to repair the vehicle. *Id*.

To assist in accurate estimating, Custom Auto subscribes to an online estimating program called "CCC Motors" via a monthly fee.  *Id*.  CCC Motors specializes in auto collision repair estimates, and Custom Auto uses it for pricing the "flag hours" billed to its customers.  Each "flag hour" varies in costs, labor, and other factors, depending upon the scope of the work, vehicle type, and other factors utilized in CCC Motors' estimation software program, such as insurance billing guidelines common in the industry. *Id*.

Custom Auto requires some employees to record their work hours on daily time slips, including Plaintiff. Strayhorn Dec., ¶¶ 12, 15, 16; *see also* Exhibits 2 and 3 attached to Motion for Summary Judgment.  Plaintiff was a commissioned employee who was required to receive pay based upon a certain rate, so Custom Auto recorded his actual work hours in order to assess that rate.  Strayhorn Dec., ¶ 12. Plaintiff also reported his hours billed on each customer project

through Custom Auto's billing system. *Id*. Plaintiff was paid 40% on the hours billed to Custom Auto's customers. *Id*.

Regardless of the time Plaintiff spent on each vehicle to complete a job, he was paid a percentage for the number of flag hours allotted to his work on a particular vehicle. Strayhorn Dec., ¶¶ 14, 17; Fulmer Dec., ¶ 13. This work was sometimes split among a team of other painters who all worked together on the same projects for efficiency. *Id*. at ¶ 14. The more efficiently Plaintiff and his co-workers finished a customer's repair job, the more they would earn for the hours actually spent working on the job and the more jobs they could bill hours thereby increasing their compensation. *Id*. In all cases, Custom Auto accounted for billed hours and Plaintiff received only commissions based on billed hours rather than hours worked. *Id*. Plaintiff had no guaranteed salary or hourly pay rate. *Id*. at ¶¶ 14, 7; *see also* Exhibit 4 attached to Motion for Summary Judgment. These reports show all of the billed hours submitted by Plaintiff and his commissions earned from all such billings. Strayhorn Dec., ¶ 17; Exhibit 4. They also document any flag hour draw payments from projects that carried over from one week to another, as discussed above. *Id*. Like other painters, Plaintiff was compensated entirely by commissions, with no hourly rate or any straight-time base pay provided by Custom Auto.

Plaintiff was paid at a commission rate based upon his experience and skills, which Kevin Strayhorn explained to him in detail at the time of his hire (and several times thereafter). Strayhorn Dec., ¶ 18. Plaintiff was shown the billing methodology to show how his commissions were accounted for his pay at Custom Auto. *Id*. Custom Auto and Plaintiff had an agreement as to his commission pay structure, and it never changed during his employment. *Id*. Notably, Plaintiff was provided multiple opportunities that were presented to him to take on more work but he declined so the work was performed by other employees at Custom Auto. Strayhorn Dec., ¶ 19; Fulmer Dec., 15.

### III.  LEGAL STANDARDS

Summary judgment may be granted if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c); *Andrews v. Fowler*, 98 F.3d 1069, 1074 (8th Cir. 1996).  "[T]he plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case," and as such a failing necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Consequently, summary judgment should be granted where no reasonable jury could find in favor of the non-movant on any one fact essential to its claim.  *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (citations omitted); *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1094 (8th Cir. 2007) (citing *Anderson*, 477 U.S. at 248).

Once a motion for summary judgment points out the absence of proof regarding an essential element of the non-movant's case, the burden shifts to the non-movant to offer probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.  *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993).  The non-movant's evidence must raise more than "some metaphysical doubt" to withstand a motion for summary judgment.  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Fed. R. Civ. P. 56 requires that a response, by affidavits or other evidence, specifically show that there is a genuinely disputed issue of material fact.  *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) (citing *Celotex*, 477 U.S. at 322).

A plaintiff may not create a material issue of fact solely based upon his own self-serving, unsubstantiated testimony contained in his affidavit or deposition.  *O'Bryan v. KTIV Television*,

64 F.3d 1188, 1191 (8th Cir.1995) (granting summary judgment if non-moving party's only evidence to rebut the motion is conclusory, self-serving statements made in affidavit).  Nor may the non-movant in a summary judgment motion rest upon the mere allegations of his or her pleadings.  *Robinowitz v. Gibraltar Savings*, 23 F.3d 951, 954 (5th Cir. 1994).  *Id*.  It is well-settled that conclusory evidence or statements, rather than factual statements, are insufficient to support a response to a motion for summary judgment.  *Jackson*, 994 F.2d at 1304; *see also Rose-Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998); *Luciano v. Monfort, Inc.*, 259 F.3d 906, 910 (8th Cir. 2001) (citation omitted); *Weger v. City of Ladue*, 500 F.3d 710, 728 (8th Cir. 2007).

“Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.”  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  “The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law.”  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

Modern federal courts “should be somewhat more hospitable to summary judgments” than they were prior to *Celotex*, *Anderson*, and *Matsushita*.  *City of Mount Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988); *see, e.g., Stever v. Independent School Dist. No. 625*, 943 F.2d 845, 854 (8th Cir. 1991) (citing *Mount Pleasant*, 838 F.2d at 273-74).  “The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts’ trial time for those cases that really do raise genuine issues of material fact” and “need not be denied merely to satisfy a litigant’s speculative hope of

finding some evidence that might tend to support a complaint." *Id.*; *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995) (citations omitted).

## IV.    ARGUMENT

Plaintiff asserts that he was entitled to overtime compensation for hours worked under the FLSA and AMWA.  In reality, Plaintiff was properly classified as exempt from overtime pay pursuant to the FLSA and AMWA pursuant to the retail or service establishment exemption set forth in 29 U.S.C. § 207(i) and Ark. Code Ann. § 11-4-211(g)(2).  Plaintiff completed daily timecards, and his regular rate of pay, which was based on commissions of his billed hours, exceeded 1.5 times the federal minimum wage rate for all hours worked. Summary judgment is appropriate for dismissing Plaintiff's overtime claim under the Fair Labor Standards Act ("FLSA") and the Arkansas Minimum Wage Act ("AMWA"). *Jarrett v. ERC Props.*, 211 F.3d 1078, 1081 (8th Cir. 2000).

### A.    The Evidence Demonstrates that Plaintiff Was Properly Classified as an Exempt Employee Under the Section 7(i) Retail Exemption.

The FLSA generally establishes that employers must compensate each employee "at a rate not less than one and one-half times the 'regular rate' for all overtime hours that an employee works." 29 U.S.C. § 207(a)(1).  The FLSA defines overtime as employment in excess of forty (40) hours in a single workweek. *Id.* The AMWA is interpreted under the same standards as the FLSA. *See Aubrey v. Zamam, LLC*, No. 2017 WL 5180427, at *2 (E.D. Ark. Nov. 8, 2017).  An employer claiming an exemption from the FLSA's overtime requirements bears the burden of establishing that the exemption applies. *Corning Glass Words v. Brennan*, 417 U.S. 188, 196-97 (1974).

Section 7(i) of the FLSA exempts "retail or service establishment" employers from paying overtime pay under Section 7(a) of the Act to certain employees, if: (1) the regular rate of

pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under Section 206 of the FLSA (the minimum wage requirement), and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. 29 U.S.C. § 207(i); *see also* 29 C.F.R. § 779.412.  Further, the AMWA establishes an identical exemption as set forth in the FLSA.  *Compare* Ark. Code Ann. § 11-4-211(g)(2) and Admin. Rules Regarding the Arkansas minimum Wage Act, § 010.14-109(G)[1] *with* 29 U.S.C. § 207(i). The Section 207(i) exemption "was enacted to relieve an employer from the obligation of paying overtime compensation to certain employees of a retail or service establishment paid wholly or in greater part on the basis of commissions." 29 C.F.R. § 779.414. Thus, the FLSA and AMWA both exempt from overtime pay requirements employees paid on such as basis.

### 1)  *Custom Auto is a Retail or Service Establishment under the FLSA.*

To establish the applicability of 29 U.S.C. § 207(i)'s exemption, an employer must demonstrate that it is a "retail or service establishment." *See e.g. Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993).  However, when Congress added the exemption to the FLSA in 1961, it did not define the term "retail or service establishment" within 29 U.S.C. § 207(i). *See* Fair Labor Standards Amendments of 1961, Pub. L. 87–30, § 6, 75 Stat. 65, 69–70 (1961) (1961 Amendments). Rather, the definition of "retail or service establishment" derives from the former 29 U.S.C. § 213(a)(2). *See Gieg v. DDR, Inc.*, 407 F.3d 1038, 1047 (9th Cir. 2005); *see also Reich*, 3. F.3d at 1183 ("Section 207(i) does not define [retail or service establishment]; instead, we must turn to § 213(a)(2)."); *but see Alvarado v. Corporate Cleaning Servs., Inc.*, 782 F.3d 365, 369–70 (7th Cir. 2015). "This section [29 U.S.C. § 207(i)] wholly exempts certain 'retail or

---

[1] Available online at https://www.labor.arkansas.gov/wp-content/uploads/2020/08/MW-and-OT-Rules.pdf.

service establishment[s]' from FLSA coverage and defines 'retail or service establishment' as 'an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry.'" *Reich*, 3 F.3d at 1183 (quoting 29 U.S.C. § 213(a)(2) (repealed)); *see also Gieg*, 407 F.3d at 1047.

When Congress passed 29 U.S.C. § 207(i) in 1961, it "specifically stated that the term 'retail or service establishment' was to have the same meaning in that section as it did in 29 U.S.C. § 213(a)(2)." *Reich*, 3 F.3d at 1183 (citing 29 C.F.R. § 779.411 (1992)); *see also Gieg*, 407 F.3d at 1047 (Congress "intended the term 'retail or service establishment' to have the same meaning" as 29 U.S.C. § 213(a)(2)); 29 C.F.R. § 779.24; *but see Alvarado*, 407 F.3d at 1047 (noting congressional session reports are not law). In 1989, Congress repealed 29 U.S.C. § 213(a)(2), including its definition of "retail or service establishment." *Reich*, 3 F.3d at 1183; *see also Gieg*, 407 F.3d at 1047. "Congress did not, however, repeal [29 U.S.C.] § 207(i) nor change its dependence on the definition of 'retail or service establishment.'" *Id*. As such,

> any construction of the term as defined in § 213(a)(2) became a part of the definition of the term as found in § 207(i). Nothing in the 1990 amendments [to the FLSA] changed § 207(i). The term "retail or service establishment" still remains, and there is no expression of congressional intent that it should be construed any differently. Absent specific congressional intent, we will not conclude that Congress retained the term "retail or service establishment" in § 207(i) yet at the same time discarded thirty years of established meaning.

*Reich*, 3 F.3d at 1183; *see also Geig*, 407 F.3d 1047 ("Although § 213(a)(2) was later repealed, courts have continued to apply its definition of 'retail or service establishment' to Section 207(i)."); *but see Alvarado*, 407 F.3d at 1047.

Defendants appreciate that this Court is aware of the pertinent analysis of the FLSA's Section 7(i) exemption as outlined in *Carlton v. JHook Investments, Inc.*, 2019 WL 4784801

(E.D. Ark. Sept. 30, 2019).   Accordingly, as a summary, to qualify as a "retail or service establishment," an employer: (1) must "engage in the making of sales of goods or services"; (2) "75 percent of its sales of goods or services, or of both, must be recognized as retail in the particular industry"; and (3) "not over 25 percent of its sales of goods or services, or of both, may be sales for resale." 29 C.F.R. § 779.313.

### i.   Custom Auto Engages in the Making of Sales of Goods or Services.

To determine if a business is engaged in the making of sales of goods or services, U.S. Department of Labor regulations identify various considerations, including whether the business:

- Sells goods or services to the general public.
- Serves the everyday needs of the community.
- Is at the very end of the distribution stream.
- Disposes of its products and skills in small quantities.
- Takes part in the manufacturing process (a retail or service establishment is not involved in manufacturing).

29 C.F.R. § 779.318(a).  Retail or service establishments provide their products or services for the comfort and convenience of the general public in the course of its daily living, including, for example, *repair services*, food and drink, furniture, cars, hotels, restaurants, barber shops, and clothing and hardware stores.   *See* 29 C.F.R. § 779.318(a) (emphasis supplied). Notably, a business may still qualify as a retail or service establishment if its customers or end users are commercial entities. 29 C.F.R. § 779.318(b). In other words, a business may qualify even if it sells products that are rarely purchased for family or noncommercial use.; *See* U.S. DOL Opinion Letter FLSA, 2018 WL 4562931 (Aug. 28, 2018).)*; see also* 29 C.F.R. § 24; § 779.411.

Notably, the U.S. Department of Labor Field Operations Handbook identifies repairs on privately owned cars (even if paid for by insurance companies) constitutes retail sales under Section 7 of the FLSA.   *See* DOL Field Op. Handbook Chapter 21ca04(d), available at

11

*https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-21#B21ca04*.       Further, repairs made for commercial clients that are ultimately used for their own customers are still retail sales under the Section 7(i) exemption.  In *Alvarado*, 782 F.3d 365, the Seventh Circuit analyzed a company that provided window washing services to its customers and the definition of a retail establishment under this FLSA exemption. There, the Court analyzed in detail various retail scenarios where service providers sell their services to a customer (end users) which are incorporated into the customers' business (window washing, truck sales, and jewelry sales, yet the sales did not convert to "wholesale" sales because the retailers' customers are not turning around and re-selling the same service to their own customers.  *Id*. at pp. 369-71.  That Court noted that commission sales for these services "fits the rationale for the exemption."  *Id*. at 370.

Neither the FLSA nor the DOL regulations specifically define a "bona fide commission rate" or a "commission." *See Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001) (finding that whether the payments constituted commission is an issue of law, but "finds little illumination from the sparse case law and the vague references in statutes and regulations."). However, the regulations do state that "[a] commission rate is not bona fide if the formula for computing the commission is such that the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee)." 29 C.F.R. § 779.416(c).

The commission payments provided to Plaintiff by Custom Auto are strikingly similar to the commission plan in *Pittman v. McClain's R.V., Inc.*, 2013 WL 12139092 (E.D. Tex. June 12, 2013).[2]  There, the Court analyzes the "flag rate" system that utilizes a "flat rate manual" to

---

[2] A copy of this unreported opinion is attached to Defendants' Motion for Summary Judgment as Exhibit 6.

estimate the price of an RV repair will cost a customer, from which the service technicians received a commission.  *Id*. at \*8-\*9.  That Court found persuasive the DOL Field Operations Handbook's guidance:

> Some auto service garages and car dealerships compensate mechanics and painters on the following basis: The painter or mechanic gets so much a "flat rate" hour for the work he or she performs. A "flat rate" hour is not an actual clock hour. The painter or mechanic may work only 7, 8 or 9 hours a day and still receive credit for 10, 11 or 12, etc., flat rate hours depending upon how much work he or she has done. Each job is assigned a certain number of hours for which the customer is charged, regardless of the actual time it takes to perform the job. The employee is given a certain proportion of that charge expressed in terms of so many dollars and cents per "flat rate" hour rather than in terms of a percentage of the charge to the customer. The dealer does not change the employee's share per flat rate hour if the charge to the customer is changed. In such situations Wage-Hour will not deny that such payments represent "commissions on goods or services" for purposes of Sec. 7(i) (*see* IB 778.117 and 779.413(b)). Such employment will qualify for exemption under Sec. 7(i) provided all the other tests of the exemption are met.

DOL Field Operations Handbook, Section 21h04(d). Other courts have likewise found comparable commission payments based upon pre-determined repair estimates rather than hours worked as appropriate under the Section 7(i) exemption of the FLSA.  *See, e.g., Klinedinst v. Swift Innovations, Inc.*, 260 F.3d 1251 (11th Cir. 2001).

Similarly here, Custom Auto provides auto body collision repair services to individuals and some commercial clients only.  These sales are offered as a comfort and convenience to the general public in the course of daily living. 29 C.F.R. § 779.318(a).  Anyone who has had a minor fender bender or automobile accident appreciates the importance of auto body repair services. These services provided by Custom Auto are provided on a vehicle-specific, as-needed basis and not in mass quantities.  *Id.*; *see* Strayhorn Dec., ¶ 8.  Further, the services provided by Custom Auto are not (and cannot) be resold.  29 C.F.R. § 779.331 ("A sale is made for resale where the seller knows or has reasonable cause to believe that the goods or services will be resold.").

13

Plaintiff's commissions were based entirely on the sales made to Custom Auto's customers and not tied to hours worked.  Strayhorn Dec., ¶¶ 13-14.  Moreover, Plaintiff could increase his regular rate by working more efficiently and also increase his compensation by working on more jobs, though he often declined such opportunities. *Id*. at ¶ 19; Fulmer Dec., ¶ 15.  These sales, therefore, easily fall within the retail or service concept of the FLSA's Section 7(i) exemption.

ii.  <u>More than 75% of Custom Auto's Sales are Recognized as Retail, and Not Over 25% are Sales for Resale.</u>

Custom Auto's retail sales easily exceed the threshold established for the FLSA's Section 7(i) exemption.  This element of this exemption was also examined by the court in *McClain's R.V., Inc.*, 2013 WL 12139092.  There, the Court found that an employer's affidavit testimony establishing that more than 75% of the business's revenue was from retail sales from the sale of new or used RVs as well as repairs to RVs satisfied this element.  *Id*. at *5-*6.  Moreover, the plaintiff in *Yi v. Sterling Collision Cntrs., Inc.*, supra, did not even dispute the retail nature of such work, and that Court granted summary judgment to the employer.

Here, Custom Auto has provided evidence that more than 75% of its revenues derived from the retail sale of goods and services to its customers; in fact, 100% of revenues qualifies as retail sales or services.  Strayhorn Dec. ¶¶ 4-5; *see* Attachment A referenced therein.  There is no allegation that its sales are made for goods or services for resale or as wholesale.  Accordingly, this element is satisfied, and summary judgment is appropriate pursuant to Fed. R. Civ. P. 56.

**2.**   ***Plaintiff was paid entirely by Commissions.***

In order to qualify for the Section 7(i) exemption, Plaintiff must have been paid by more than 50% commissions in a representative period of not less than one month.  29 U.S.C. § 207(i); *see also* 29 C.F.R. § 779.412.  The U.S. Department of Regulations provide insightful guidance

on this issue by listing common, but non-exhaustive examples of compensation plans that reflect typical pay structures for retail store employees. *See* 29 C.F.R. § 779.413(a). Typically, commission payments are keyed to the establishment's sales, and not hours worked. *Id.* at 779.413(b).  In contrast, a formula for computing commissions pursuant to which the employee "in fact, always or almost always earns the same fixed amount of compensation for each workweek (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee)" is not a bona fide commission payment plan. *Viciedo v. new Horizons Computer Learning Cntr.*, 246 F.Supp.2d 886, 896 (S.D. Ohio Feb. 26, 2003) (citing 29 C.F.R. § 779.416(c)). In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee. 29 U.S.C. § 207(i).

In *Yi v. Sterling Collision Cntrs., Inc.*, 480 F.3d 505 (7th Cir. 2007), the Seventh Circuit once again provides insight into this element of the Section 7(i) exemption.  Judge Posner insightfully analyzes an auto body repair shop's compensation plan that is strikingly similar, if not identical, to Custom Auto's and Plaintiff's compensation arrangement, and found:

> Sterling, the defendant, a chain of auto repair shops, charges its customers as follows. It calculates the number of hours normally required to do a given type of repair (these are called "booked hours") and multiplies that number by a dollar figure. The product of this multiplication is the labor price of the repair to the customer. Sterling adds material costs to the labor price to come up with a final price. A team of mechanics is then assigned to the job. Each member of the team keeps track of the hours he works on the job. When it's completed and the hours of the team members are added up, Sterling determines each member's compensation by multiplying (1) the number of booked hours for the job by (2) the ratio of the team member's actual hours worked to the total hours worked by the team, and then by (3) a wage, per booked (not actually worked) hour, based on the skill or quality of the individual team member.

* * *

15

The faster the team works, the more it earns per number of hours, since its commission is based not on the total number of hours it puts in on a job but on the number of booked hours times each team member's booked-hour rate. That is how commissions work; they are decoupled from actual time worked. The percentage rate is implicit in Sterling's method of compensation. It is equivalent to paying the team a percentage (46 percent in our example) of the labor component of the price of their service to the customer.

* * *

*Although the mechanics are paid by the job, this is not piecework* (which is not exempt from the overtime provision, 29 U.S.C. § 207(g); *United States v. Rosenwasser,* 323 U.S. 360, 363, 65 S.Ct. 295, 89 L.Ed. 301 (1945); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *McLaughlin v. Seafood, Inc.,* 861 F.2d 450, 452–53 (5th Cir.1988)), any more than selling real estate is piecework. You can spend 40 hours a week making quilts, and be paid by the quilt, and you won't be in the position of having to work overtime one week in order to make up slack time in the previous week. But if you're paid by the sale, you can't count on working steadily the same amount of time week after week, because sales depend on buyers' decisions, which are unpredictable; in the present case sales depend on the flow of wounded cars into each of Sterling's local repair shops.

*Yi*, 480 F.3d at 509-11 (emphasis supplied). Judge Posner concluded that the "system of compensation used by Sterling is industry-wide, and of long standing." *Id*. at 510 (citing Department of Labor, Wage & Hour Division, § 21h04(d); "FLSA Compliance: Retail and Service Exemptions From Overtime Rules," *Payroll Practitioner's Monthly,* Oct. 2006; Ed Kovalchik, "Hourly Tech Pay Plans—Automobile Mechanics," *Ward's Dealer Business* (Apr.1996), http://findarticles.c om/p/articles/mi—m0FJN/is—n8—v30/ai—18728424). "It is possible for an entire industry to be in violation of the Fair Labor Standards Act for a long time without the Labor Department noticing. But a more plausible hypothesis is that the auto repair industry has been left alone because the character of its compensation system has been recognized for what it is—a bona fide commission system." *Id*. at 510-11.

Here, this element is easily satisfied by Defendants because Plaintiff was paid entirely by commissions. Strayhorn Dec., ¶¶ 13-14; Fulmer Dec., ¶ 12; *see* Exhibit 4. More specifically, the

payroll reports for Plaintiff show that his entire pay was based on commissions. *See id*. These commissions are decoupled from the actual hours worked by Plaintiff, which supports a finding of a bona fide commission plan that is not designed to circumvent the overtime requirements established by the FLSA. *Id*.; *see Yi*, *infra*. Despite Plaintiff's allegations, this compensation is not piece rate; rather, it is an industry-wide model of commissions. Accordingly, there is no genuine dispute of this material fact and summary judgment is appropriate.

c.      *Plaintiff's Regular Rate of Pay Exceeded the Federal Minimum Wage Rate*.

Finally, Defendants recognize that the entitled to the FLSA's Section 7(i) exemption for Plaintiff requires a showing that Plaintiff's regular rate of pay exceed 1.5 times the federal minimum wage rate. 29 U.S.C. § 207(i); *see also* 29 C.F.R. § 779.412. To calculate the regular rate of pay, "[i]t is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate." *Id.* § 779.419(b) (citation omitted). Put differently, "[t]he regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." *Id.* § 778.109. Commissions, "whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula" are part of this calculation:

> This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission.... The fact that the commission is paid on a basis other than weekly, and that payment is delayed for a time past the employee's normal pay day or pay period, does not excuse the employer from including this payment in the employee's regular rate.

*Id.* § 778.117. A "single workweek" is the relevant time period for regular rate calculations;

"averaging of hours over [two] or more weeks" is not permitted. *Id.* § 778.104. This time period limitation applies to "employees paid on a commission basis." *Id.*

Here, Plaintiff maintained time records for all hours worked and his payroll records recorded all of his remuneration paid (all in the form of commissions) for each workweek. His regular rate exceeded the federal minimum wage rate of $7.25 at all times and averaged more than $24.00 per hour during the relevant time period. Thus, his weekly regular rate is easily computed and evidenced on the records provided. *Compare* Exhibits 3 and 4. This element, too, is satisfied and Defendants are entitled to summary judgment as Plaintiff was properly classified and paid as a commissioned employee pursuant to 29 U.S.C. § 207(i).

> ### B.   Plaintiff's Alleged Damages, if any, Should Be Limited ot the Times Reported on His Timecards.

Defendants contend that summary judgment is appropriate on Plaintiff's individual claims brought under the FLSA and AMWA. If for any reason the Court finds that summary judgment is not appropriate at this time, Defendants request an Order limiting Plaintiff's claim for alleged damages to the work times recorded on the records maintained and produced by Custom Auto. *See* Exhibits 2 and 3. These records were all maintained in the ordinary course of business by Custom Auto. Plaintiff himself completed the time slips used in recording his work hours. *Id.*

The FLSA and AMWA prohibit the employment of any non-exempt employee "for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1); Ark. Code Ann. § 11–4–211(a). The FLSA and AMWA also require the employers to keep accurate time records. *See* 29 U.S.C. § 211(c); 29 C.F.R. § 516.2; Ark. Code Ann. § 11–4–217. An employee who sues for unpaid

overtime "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds*; *see also Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 881 (8th Cir. 2012).

When an employer fails to maintain accurate time records, *Anderson* relieves the employee of proving the precise extent of uncompensated work and creates a relaxed evidentiary standard. *Carmody v. Kansas City Bd. Of Police Com'rs*, 713 F.3d 401, 406 (8th Cir. 2013) (citing *Anderson*, 638 U.S. at 687). Under this relaxed evidentiary standard, once the employee has shown work performed for which the employee was not compensated, and "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," the burden then shifts to the employer to produce evidence to dispute the reasonable of the inference. *Carmody*, 713 F.3d at 406 (citing *Anderson*, 328 U.S. at 687–88). "*Anderson* only applies where the *existence of damages is certain*. *Anderson* allows uncertainty *only for the amount of damages*." *Carmody*, 713 F.3d at 406 (citing *Anderson*, 328 U.S. at 688) (emphasis supplied). While "[a] fact finder may rely on a plaintiff's recollections of time worked where the employer 'maintained *none* of the employment records required by the FLSA,'" *Goal v. Retzer Resources, Inc.*, No. 5:09CV00137 JLH, 2010 WL 4867966, at *9 (E.D. Ark. Nov. 3, 2010) (quoting *Mumbower v. Callicot*, 526 F.2d 1183, 1186 (8th Cir. 1975)) (emphasis added), Plaintiff still bears the initial burden of demonstrating that work was performed outside of the records. *See Anderson*, 328 U.S. at 687–88.

Here, Defendants have provided time records that captured all hours worked by Plaintiff. He personally completed his daily time slips, which are summarized on the timesheets for each workweek during which Plaintiff was employed by Custom Auto. *See* Exhibits 2 and 3. These records show only a few weeks where any alleged overtime pay could even be claimed and at a

rate based upon his commissions only.  Plaintiff has neither alleged nor provided no evidence of any "off-the-clock" or unrecorded work times. Thus, Defendants are entitled to an Order that limits any damages sought in the trial of this matter to the times reported on his time and pay records should the Court find any reason to not grant summary judgment in its entirety.

### C. **Plaintiff's AMWA Claim Also Fails at Law.**

Employees who are exempt from overtime compensation under the FLSA are not entitled to overtime compensation under the AMWA. *See* Ark. Code Ann. § 11-4-211(d).  As discussed above, Plaintiff was properly classified as exempt from overtime compensation. *See* Argument, § IV.A., *supra*.  Thus, his claim under the AMWA also fails at law. *See Zamam, LLC*, No. 2017 WL 5180427, at *2 ("Because the FLSA and Arkansas Minimum Wage Act impose similar overtime requirements, and claims brought under parallel provisions of the acts should be interpreted similarly . . . ."). "The FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner." *Cummins v. Bost, Inc.*, 218 F. Supp. 3d 978, 985 (W.D. Ark. 2016) (quoting *Carter v. Primary Care Home Care of Hot Springs, Inc.*, Case No, 6:14-cv-6092, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015)). Therefore, the authority interpreting the FLSA warranting summary judgment as to Plaintiff's FLSA claim against Patel contained in this Brief similarly warrants summary judgment as to Plaintiff's AMWA claim against Defendants.

Defendants respectfully request that Plaintiff's AMWA claim be dismissed along with his FLSA claim for alleged overtime pay.

### V.   CONCLUSION

Plaintiff has failed to create any genuine issue of material fact.  Plaintiff was an exempt employee under the FLSA and AMWA and, therefore, he was not entitled to overtime pay.  Even

if a question of fact exits as to whether he was misclassified, Defendants are entitled to an Order limiting his claims to the time records provided in Exhibits 2-3.   Accordingly, Defendants respectfully request that their Motion for Summary Judgment be granted in its entirety.

Respectfully submitted,

Gregory J. Northen (ABA#2011181)
Michael J. Berry (ABA#2021)
CROSS, GUNTER, WITHERSPOON
  & GALCHUS, P.C.
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
Phone:  501-371-9999 / Fax:  501-371-0035
E-mail:  mberry@cgwg.com
E-mail:  gnorthen@cgwg.com
**ATTORNEYS FOR DEFENDANTS**